All right, I see Ms. Lamb and Mr. Rozinski, and now Mr. Carlson is with us. All right, can you all hear me? Yes? Yes, Your Honor. All right. Yes, Your Honor. And I believe, Ms. Lamb, you're going first, is that right? That is right. All right, you may proceed. All right. May it please the Court, Katherine Lamb for the United States. This appeal is about police using minor children to interpret for deaf parents. The district court erroneously instructed the jury that police need not interfere in an individual's decision to use her own child to facilitate her communication. This instruction conflicts with Title II of the Americans with Disabilities Act as interpreted in the Department of Justice's implementing regulations, which obligate public entities to ensure effective communications with individuals with disabilities. When an interpreter is needed to communicate effectively, public entities may not rely on minor children to carry out their effective communications obligation absent an imminent emergency. There are at least three rationales that support the department's rule. First, interpreting may expose minor children to sensitive adult subject matter that is not appropriate. Second, it may place these children in an inappropriate position vis-a-vis their adult relatives and may be a request that is difficult for the child to decline. And third, the children may lack impartiality or specialized vocabulary that is necessary to provide effective communications, which is the obligation of the public entity. Even if the record showed that plaintiff chose to use her children to interpret, the district court's rule might harm the child, the family, and the effectiveness of the communications themselves. And perversely, the district court's rule also would set a lower bar for minor children to interpret than adults, simply based on a parent's decision to use the minor child rather than the requirements of a specific request, the consent of the adult companion, and appropriate circumstances that would make it acceptable for an adult companion to do the interpreting for the individual with a disability. The district court's reasons for adding its erroneous instruction were twofold. First, the judge's apparently personal intuition about the interpretation skills of a child of deaf parents, which certainly cannot override the Department of Justice's regulations. And then the court's apparent misreading of the Title II regulations requirement in 28 CFR 162, which basically states that in determining the type of auxiliary aids or services that the public entity must furnish to accomplish effective communications, the entity must give primary consideration to the requests of the individual with disabilities. Providing primary consideration to an individual's requests, that does not support the district court's rule that police need not interfere with an individual's decision to use her own child to facilitate communication. And that's clear from the language and structure of the regulation in question 35160. So to explain that a bit, Your Honors, the primary consideration obligation falls within subsection E2, and that discusses how the type of auxiliary aid is selected to effectuate effective communications. It doesn't go to the specific manner in which that appropriate aid needs to be delivered. Subsections C and D, C of which is an issue here, then talk about what the requirements are, where an interpreter is the appropriate form of communication. Second, the language of B2 talks about a primary consideration that goes to the individual's request. A primary consideration, of course, is not a sole consideration or one that would override other considerations, which are contained in B2, and that might ensure that the communication is indeed effective, such as timeliness, such as the ability of the aid or the interpreter or whatever it might be to actually carry out the communication. Well, the district court's instruction seems to have taken that into account. It said that the police need not, well, first of all, it says the police officers shouldn't rely on a minor child except in an emergency, but they need not interfere in a private citizen's decision to use a minor child. So it's permissive. You're suggesting that that's an improper reconciliation of the apparent internal conflict in this regulatory scheme? Well, Your Honor, I don't believe there is a conflict here. Subsection C3 simply states that the public entity shall not rely on the minor child to facilitate, absent certain emergency circumstances, which certainly may exist. What's going on in B2 is saying that where there is a request for a particular type of aid, that that should be given primary consideration. But what C3 is saying is that the minor child cannot be or cannot effectuate the effect of communication. Ms. Lamb, both subsections are phrased in mandatory terms, and so it puts the police and other public officials in something of a quandary. Both use the word shall. Shall not use a minor except in emergency circumstances, and shall give primary consideration to the citizen's request for a particular type of interpreter or auxiliary aid, which includes interpreter services. So that somehow the police have to reconcile those two shalls. And it seems to me that the district court's instruction to the jury was a very reasonable way to reconcile those two shalls. Your Honor, I respectfully disagree, and I see that I'm over my time, but I'd like to make two points here. First, while these are two shalls, the shall in B2 is to give primary consideration. It is not to say that the public entity shall enact the choice of the individual in every circumstance. That's not what it says. It says primary consideration, so there's no conflict there. The second point, though, Your Honor, is that what the district court stated did not use the language of request. Rather, the district court used the language of decision, and a decision and a request certainly are not the same thing. A request is something that is asked for. A decision might be exactly what these regulations were designed to avoid. A person with a disability has to interact with a public entity. They are not provided or offered or given any opportunity to state they need a particular auxiliary aid or service. Ms. Lamb, your interpretation in your reading of this defies the common sense realities of the police in the field. Police have to respond to evolving circumstances, many of which are emergencies, some of which fall short of being an emergency but nonetheless require immediate action of some sort on the part of the police, and to adopt the kind of rigidity that you're proposing on behalf of the United States seems to me to be completely unworkable in the real world, and that can't possibly be the import of these regulations. Well, respectfully, Your Honor, I certainly disagree with that. There is an emergency exception that deals with, I think, the vast majority of the scenarios you are concerned about, where there is an imminent threat to safety or welfare of a person or the public. Additionally, the right-line rule established in C-3 is, in fact, designed to give police clear guidance as to what they cannot do in this one very narrow circumstance, which is where the person who is, I guess, with the individual with the disability happens to be a child, and there is no emergency going on without an interpreter being on hand. So it's, in fact, a very narrow and defined and clear rule for police to follow in those circumstances, and indeed, many circumstances where police are interacting with an individual with a disability may not require the use of an interpreter. That is what the work that subsection B-2 is doing. It's helping public entities figure out what kind of communication aids are necessary, if any, to effectuate effective communications. It may well be that in a given circumstance that falls short of an imminent threat, that there is, you know, pencil and paper are sufficient. All right. We're going to have to move to Mr. Rosensky at this time.  Thank you, Your Honor. Mr. Rosensky. Good morning, and may it please the Court. My name is Andrew Rosensky of Eisenberg & Baum. I'm the attorney for Rene Lange, the appellant. The merits of this appeal warrant this court's reversal of the district court because that court erred in four significant ways. First, the trial court erred when it instructed the jury that police not need interfere, however, in the decision of a private citizen to use his or her own child to facilitate her communication. This misstatement of law… Mr. Rosensky, can you jump right to if the court's instruction was a misstatement of the law, why should we remand this for a new trial? The first two instances at least seem to strike me as clearly exigent circumstances. In the third and fourth incidents, I'm not sure why the police needed to or even were communicating with your client to begin with. It just didn't… I guess the rule… I'm concerned the rule that you're proposing here is totally unfeasible for police officers in the field. I mean, the police officer, the way I understand it, the police officer shows up on May 30th and probably could have arrested your client without saying a single word to her for these noise ordinance violations. And it was the client's… your client's child, I believe, who had called the police or the neighbor, but the client was clearly talking to the police. What would you have the police officers do in that circumstance other than just arrest your client? I think they tried to give her a break by saying, hey, we're leaving. If we get called… this happens, by the way, in the real world. We got called with a noise ordinance and we're going to give you a chance here. We're not going to just lock you up. And she failed that chance, but what were they supposed to do? So, this police department is supposed to have qualified sign language interpreters on contract and ready to call when necessary to communicate with people who need them. This police department did not have anything in place. It is their affirmative obligation to provide qualified interpreters. The fact that nobody was trained, no one had anything in place, they didn't know who to call, what to do. They have this affirmative obligation and they failed to have anything in place to even call somebody. Also, there are many police departments these days use something called VRI, a video remote interpreter, and where they have an iPad or an iPhone or a laptop in their cruiser that they can use to communicate on demand with a qualified sign language interpreter 24 hours a day, 7 days a week. The technology these days allow any police officer to provide a qualified interpreter. I hear you. I hear what you're saying. But with respect to these two instances, what difference does any of that make? If someone commits a crime and a police officer sees them commit a crime and a police officer goes to effect arrest, the police officer doesn't first say, do you speak English? The police officer says, you're under arrest. And they place them under arrest and then they bring them to the police station. If the person doesn't speak English, perhaps they can get an interpreter later. Perhaps under the Fourth Amendment, we would suppress statements that the person may have made in the back of the police car. But the police officer certainly isn't going to say, shoot, I can't arrest you. You don't speak English. I need to get an interpreter out here for you to understand that I'm going to handcuff you. Well, we need to look at the specific circumstances of the situation. And in this situation, it is undisputed. They all attempted to and communicated with Ms. Lange through her minor children. And I understand that these arrests could be effectuated without speaking. But in this case, under these undisputed facts, they did communicate significantly with Ms. Lange. The law requires that she have a right to have effective communication, a qualified interpreter. A minor child can never be a qualified interpreter. And it's undisputed that this minor child did not have the necessary skills as required by the definition of qualified interpreter under the regulations. And so in these circumstances, what police officers are supposed to do is to make sure that they have these services readily available because of the technology that's available. And they should not rely on minor children. That's not right. I don't agree with that. And I think what the police officers are supposed to do are to ensure that they can have effective communication with your client despite the lack of an interpreter. I think that's – and what I'm asking is what was the ineffective communication with your client assuming she asked for an interpreter and didn't have one? The ineffective communication was her ability to understand what was going on, what the officers were talking to her children about, her minor children about, and talking to her about. But why would she be – I mean, I guess why would – I don't want to keep belaboring the point. But if my neighbor called the police on me and then my neighbor were talking to the police officer, I would have no – I couldn't interfere with that, jump in between and say, wait, I need to know what you're saying. And that seems to me to be what happened here. Those are the – at least the way I understand the facts, the daughter was at least one of the complaining folks. Yeah, so in this circumstance, a hearing person, a hearing parent would be able to understand everything that's going on around them. They would not have to rely on their children for communication. And deaf people are treated differently. They are blocked from that information because of their disability and because of the lack of effective auxiliary aids and services that are provided to them. It is not – there are many police departments in this country that are following what the law requires under the ADA, and they are providing qualified interpreters through VRI systems and through having contracts with interpreters on demand for when they need to communicate with deaf persons and when deaf persons need to communicate with them. Whether the arrest or whether these things require a – you know, people to talk with the police or understand what's going on is irrelevant. But here, there were significant communications that they didn't get. And going to your emergency exception point, Your Honor, I just want to say that the regulations say that you're only supposed to use a minor child in life-altering and life-ending situations. And in our brief, all of their police officers readily admit there was no life-altering situation, no life-ending situation. And because those are the two only exceptions that should apply, and all of their officers admit that there was no violence, no exigency on the scene, that they should – that exception does not apply. Whether – you can argue that any circumstance is an emergency exception, but the Department of Justice made it very clear that it has to be life-ending or life-altering. Otherwise, you cannot do it. You have to give Chevron deference to these regulations. You cannot disregard them. And they fully comport with the statute that is meant to protect deaf persons in their communications with the police. And I understand that the police have a job to do, but they also need to have a law. They cannot have no training, no policies, no contracts in place, and then just say, well, sorry, we didn't get you an interpreter. These people didn't even attempt to call for an interpreter on any of these occasions. And so to give them a pass because they were not prepared and gave no training, despite this law being on the books for 30 years, is not what should be excused. It's not what should be required. And they need to follow the law, and they did not do so here. And so it's really important that we look at what actually happened in this case. And it's unequivocal that they tried to communicate with Ms. Lange, and she tried to understand what was going on, and they did nothing to provide her with a qualified interpreter. And so if anyone — I guess that's where I'm not so sure on the facts. It doesn't seem like they tried to communicate with her as much as she tried to communicate with them, particularly in the second two instances. Oh, she did try to communicate with them, and the officers admitted that she tried to communicate with them, and she testified and her son testified. If you look at all the citations that we give you, it would clearly show that their need to communicate with each other is, in fact, undisputed, and that the appellee's assertions that there was no need to communicate are false. In our reply, we point out by citing to the record all of the false statements that they put in their moving papers about no need to communicate, there was no communication going on. That is completely inaccurate from the trial record. All right. Your time has expired. Thank you very much. We'll move to Mr. Carlson. May it please the Court, Richard Carlson for the City of Oconto and the City of Oconto Falls. There is nothing false in our brief. Mr. Carlson, you're going to have to speak up a little bit or get a little closer to your microphone. There is nothing false or inaccurate in our brief. The testimony was very clear and concise by the officers. This is sort of a technical expose on a police performing their duties in difficult situations. The police are not required to provide an interpreter for every interaction. Whether an interpreter or other communication aid is required depends on the needs of the requesting individual. Regulations provide other communications aid include written notes, lip reading, and, of course, speech, if there is speaking ability. The ADA requires the express choice of the disabled should be given primary consideration in determining which communication aid to provide. The ultimate decision is made by the police department. Ms. Lang had significant communication abilities. These communication abilities were apparent from over 100 interactions with the police over a three-year period. There were approximately 50 interactions with Ms. Lang that preceded her first claim on May 30, 2016. Every officer had multiple interactions with her prior to the four incidents at issue. Ms. Lang was adept at effectively communicating by written notes. The writing examples and evidence speak for themselves. Ms. Lang testified as follows. Paper and pen are my best friends. Eight of the officers testified that Ms. Lang was adept at reading and writing and that effective communication was possible by written notes. Officers had numerous interactions with Ms. Lang where effective communication was solely by written notes and nothing else. Ms. Lang was adept at effectively communicating by lip reading. In prior interactions with Ms. Lang, her children told officers that Ms. Lang could effectively communicate by lip reading. The officers testified that you could tell her something or ask her something and that she would answer sometimes verbally. She would make eye contact and indicate understanding. Even if a kid was interpreting, she would answer verbally or by signing before the interpretation was finished. Ms. Lang could effectively communicate by speech. Every officer reported effective communication by speech. She could convey very well what she wanted to say. There were previous contacts with Ms. Lang where speech was the means of communication alone, nothing else. Ms. Lang did not need an ASL interpreter. Ms. Lang did not need her children to interpret. The jury in this case could have readily concluded that Ms. Lang did not need any interpreter for effective communication for any of the four claims she brought. Plus, in the interactions with Ms. Lang, there was usually a combination of communication methods. On May 30th, Officer Soule communicated with Ms. Lang by pen and paper, by reading lips, verbally, and interpretation by her daughter, Raylene, when she was not responding to Officer Soule's written notes. Officer Soule, on numerous occasions, showed Ms. Lang his notepad that said, Please be quiet and go back in the house. In the over 100 interactions between the police and Ms. Lang, she requested an ASL interpreter only once on May 30th. This is after she refused to acknowledge or comply with written notes, when she was admittedly drunk, and after she was already arrested and cuffed. It was Officer Soule's clear understanding that she understood everything he had asked her to do, and it wasn't much that he asked her to do. Be quiet and go inside the house. Ms. Lang herself thwarted effective communication by her own volatile and belligerent behavior. Detective Crocker testified, if she was in a situation where she was very agitated to the point of yelling and screaming, no one could get through to her. It was very difficult to calm her down. Each one of these four incidents involved an extensive bout of Ms. Lang yelling and screaming, volatile and belligerent. Any interpretation by her children was initiated by Ms. Lang herself. As the retired Chief testified, I used notes, she used her children. If she wanted to use her children, she would call them over. Chief Rayburg testified, we kind of let her dictate how things were going to go. If she wanted to write on paper, we let her write on paper. If she used her kids, we let her use her kids. We kind of just followed her choice. Officer Crocker, Lang would initiate the communication method. She would at times call her kid over to interpret. Ms. Lang's volatile and belligerent behavior created an emergency situation which posed an imminent threat to the safety or welfare of an individual as the regulations provide. These were serious calls. She was drunk and beat her child in the front yard. That was on May 30th. She was involved in a domestic fight with a knife present. That's when her son called his uncle to call the police because he was afraid, as had happened before with his sister, that if she knew he called the police, he'd probably get a beating. The domestic fight, Ms. Lang also admitted she was drunk. In the third incident, the arrest of her boyfriend after he had just assaulted a woman. Again, belligerent, volatile, tense. It was reasonable for the officers to go with their choice to use their children to de-escalate the situation. Interfering with their choice to use their children would not have been wise at that moment. The officers testified that the situation was not safe to bring in an outside ASL interpreter. Can you imagine bringing an interpreter in situations where she is yelling and screaming and threatening? Additionally, we do not believe we have an affirmative obligation to prevent Ms. Lang from using her children. Are the officers supposed to tell the kids to go to their room? We did not choose the method of communication. Her choice was given primary consideration. And her choice was not necessary for effective communication. There were other alternatives that were used, that were available. And for that, we don't see any violation of the ADA. The jury instructions, you know, we talk about the conflict here, or the specific instruction Judge Griesbach said. But the jury instructions also had the elements that she had to prove. That plaintiff requested an interpreter, or the need for an interpreter was known or obvious. She did not request an interpreter. The defendant unreasonably failed to give primary consideration to the request for an interpreter. We did not unreasonably fail to give primary consideration of anything. She never requested an interpreter, except for that one time after she was drunk and after she was already arrested. The other four incidents and no of the other 100 instances or incidents did Ms. Lang ever request an interpreter. There was no request and there was no need. And I don't think there was any interpreter required under the law under those circumstances. I'm done. All right. Thank you very much. Mr. Brzezinski, your time had expired, but you may have a minute for rebuttal since we kept you talking in response to our questions. Sure. If the court will, if the court refers to our reply, we make very clear that the sole source of communication with Ms. Lange on these four incidents were through their children. And there is no evidence that they communicated in these four instances through any other means. If this court follows a rule allowing a standard in which police officers can use their children. And is it really a choice when a police department really fails to offer or provide a sign language interpreter and the only way that one can communicate is through someone who is there for sign language. If the court does this, children would be conscripted to be as interpreters because of police failure to offer or affirmatively try to provide sign language interpreters and you'd be giving a standard that wouldn't provide for effective communication. Ms. Lange and their children repeatedly testified that they requested interpreters and Ms. Lange even went to the police department to file complaints about them not providing her interpreters for interactions. They knew she was deaf. They knew she primarily communicated in American Sign Language. They knew she complained about their repeated failures to provide sign language interpreters, yet did nothing about it. And the court in this case even said that three out of the four instances were arguably exigent. But the appellees make no response as to why the court erred in saying one of them wasn't exigent. So if they've violated the regulation and there is no exigent circumstances as per the court in that instance or as per the appellee, then we should be given judgment as a matter of law. We believe that judgment as a matter of law should be given on all four instances, but just looking at the face of the order of the court, we should be given judgment as a matter of law for where the court determined there was no exigent circumstances. All right. You'll have to wrap up then. Excuse me? Do you have a final sentence or two? Your time has expired. No, Your Honor. Thank you. All right. Thank you very much.